**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Krish Singh,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>City of Phoenix, *et al.*,<br><br>　　　　　Defendants. | No. CV-21-00099-PHX-JJT<br><br>**ORDER** |

At issue are two motions filed by Defendants, the City of Phoenix ("the City") and Phoenix Police Department Officers Brittany Smith-Petersen and Annie Batway ("the Officers"). The first motion at issue is Defendants' Motion for Summary Judgment (Doc. 52, "MSJ"), to which Plaintiff Krish Singh filed a Response in opposition (Doc. 68, "Resp."), and Defendants filed a Reply in support (Doc. 72, "Reply"). The second motion at issue is Defendants' Partial *Daubert* Motion Re: Roger Clark (Doc. 46), to which Plaintiff filed a Response in opposition (Doc. 61), and Defendants filed a Reply in support (Doc. 67). The Court has reviewed the briefing and evidence submitted by the parties and finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court grants Defendants' Motion for Summary Judgment only as to Plaintiff's claim under 42 U.S.C. § 1983, remands to the state court for resolution of the remaining state-law claims, and denies Defendants' Partial *Daubert* Motion without prejudice to refiling the same or similar motion in state court on remand.

. . .

I.       BACKGROUND

This case involves an incident that took place on November 11, 2019, in which Officer Smith-Peterson shot Plaintiff during a relatively brief but tense encounter.

On the evening of November 11, Officers Smith-Petersen and Batway responded to reports of an attempted armed robbery at the Home Depot located at 43rd Avenue and Camelback Road in Phoenix. (Doc. 53, Defendants' Statement of Facts ("DSOF") Ex. 1 at 29:6–9; Doc. 58, Plaintiff's Contravening Statement of Facts ("PSOF"), Ex. 3 at 41:6–9.) Prior to the Officers' arrival on the scene, dispatch relayed information from the caller who reported the attempted robbery. In an initial report, the caller stated that a man was trying to rob him with a knife. (DSOF Ex. 1 at 29:6–9.) In a subsequent report, the caller stated that the man was chasing him with a knife in a parking lot. (DSOF ¶ 2.) Officers Smith-Petersen and Batway arrived on the scene at the same time in separate patrol vehicles. (DSOF ¶ 3.) Upon arrival, they saw Plaintiff walking through the parking lot. (DSOF ¶ 4.)

The Officers pulled up on either side of Plaintiff, forming an L-shaped configuration around him. (DSOF Ex. 2 at 1:55; Ex. 3 at 3:35.)[1] Officer Smith-Petersen told Plaintiff to stop and show both of his hands. (DSOF Ex. 2 at 1:50–55.) Plaintiff was holding a knife against his own throat. (DSOF ¶ 6; PSOF ¶ 6.) Officer Smith-Petersen exited the front driver's side of her patrol vehicle and told Plaintiff to "stay right there." (DSOF Ex. 2 at 1:55–2:00.) She drew her handgun, aimed it at Plaintiff, and yelled, "If you come any closer, I'll fucking shoot you." (DSOF Ex. 2 at 1:58–2:02.) She told Officer Batway to get out of the way. (DSOF Ex. 2 at 2:02–04.) She told Plaintiff to drop the knife. (DSOF Ex. 2 at 2:04–06.) In response, Plaintiff said something to the effect of, "What? I'm going to die anyway." (DSOF Ex. 2 at 2:05–08.) For the remainder of the encounter, Plaintiff continued to make statements indicating that he wanted Officer Smith-Petersen to shoot

---

[1] The Officers' interaction with Plaintiff was recorded by their body worn cameras. Both parties rely on this video evidence in their briefing; neither challenges its accuracy or authenticity. The Court describes the body-worn-camera footage to the extent it shows aspects of the interaction that are undisputed or not genuinely disputable. The parties' genuine factual disputes are discussed in the analysis that follows. To the extent either party asserts a factual contention "blatantly contradicted" by the video evidence, the Court must view the facts in the light depicted on video. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

him. (DSOF ¶ 14; PSOF ¶ 14.) However, Plaintiff did not make any verbal statements suggesting he intended to harm the Officers. (PSOF Ex. 3 at 47:3–5.)[2]

Officer Smith-Petersen proceeded to move around the back of her vehicle while continuing to aim her gun at Plaintiff. (DSOF Ex. 2 at 2:05–14.) She stopped moving once she reached the passenger's side of the vehicle, such that the vehicle formed a barrier between Plaintiff and herself. (PSOF Ex. 3 at 31:24–32:13.) She told Plaintiff, "If you come any closer, I will kill you. Do you understand?" (DSOF Ex. 2 at 2:11–14.) She told him to "put the gun down." (DSOF Ex. 2 at 2:14–15.) Plaintiff corrected her that it was a knife, which she acknowledged. (DSOF Ex. 2 at 2:15–19.) She told him to put the knife down. (DSOF Ex. 2 at 2:18–19.) He asked why. (DSOF Ex. 2 at 2:19–20.) She responded, "We can talk, I just can't talk to you when you have a knife in your hand. My guy, I can't talk to you like this. You need to make it safe for me and you." (DSOF Ex. 2 at 2:22–53.) He said something to the effect of, "I'm making it safe for you already." (DSOF Ex. 2 at 2:32-35.) She disagreed: "While you have a knife in your hand, neither one of us is safe, OK? So just drop it and we will talk." (DSOF Ex. 2 at 2:35–42.) Plaintiff did not comply and continued to hold the knife against his own throat. (DSOF Ex. 2 at 2:10–4:06.)

By this time, Officer Batway had moved closer to Officer Smith-Petersen but maintained some distance. (DSOF Ex. 3 at 4:08–11.) She had her gun aimed at Plaintiff. (DSOF Ex. 3 at 4:13.) Officer Batway told Plaintiff they just wanted to help. (DSOF Ex. 3 at 4:22–38.) He said something to the effect that he did not want any help. (DSOF at 3 2:50–55.) He appeared to shuffle and the Officers told him to stop. (DSOF Ex. 2 at 2:55-57; DSOF Ex. 3 at 4:26–29.) He said that everyone in his family thinks he's crazy. (DSOF Ex. 3 at 4:35–38.) Officer Batway told him they did not think he was crazy. (DSOF Ex. 3 at 4:39–41.) Officer Smith-Petersen added, "We don't. But you need to understand." (DSOF Ex. 2 at 3:09–19.) Plaintiff moved forward and stopped. (DSOF Ex. 2 at 3:10–15.) Officer Smith-Petersen said, "Hey, one more step towards me." (DSOF Ex. 2 at 3:15–19.)

---

[2] As Plaintiff notes, the audio of his statements is less clear and discernable than the audio of the Officers' statements. (*See, e.g.*, PSOF ¶ 14.)

- 3 -

Plaintiff told her to shoot him and pointed to his head. (DSOF Ex. 2 at 3:16–18.) She told him she did not want to shoot him. (DSOF Ex. 2 at 3:18–20.) He again told her to shoot him, saying it was "all good." (DSOF Ex. 2 at 3:27–30.) She said, "No, it's not. You want that on me? You want to put that on my conscience—that I have to shoot you?" (DSOF Ex. 3:30–36.) He responded, "It's all good." (DSOF Ex. 2 at 3:34–36.) She told Officer Batway, "If he takes one more steps towards us..." (DSOF Ex. 2 at 3:40–42.)

Plaintiff continued to tell the officers he wanted them to shoot him; they continued to tell him they did not want to do so and tried to calm him down. (DSOF Ex. 2 at 3:19–4:01.) For the majority of the interaction, Plaintiff was facing Officer Smith-Petersen. (DSOF Ex. 2 at 2:05–400.) Her patrol vehicle was between them. (DSOF Ex. 2 at 2:05.)

Approximately two minutes into the interaction, Plaintiff slowly began to move around the front passenger's side corner of the patrol vehicle, toward Officer Smith-Petersen. (DSOF Ex. 2 at 4:01–04.) He said something to effect of, "I want to get shot." (DSOF Ex. 2 at 4:02–04.) Officer Smith-Petersen told him to stop. (DSOF Ex. 2 at 4:04–05.) He told her, "Go ahead ma'am." (DSOF Ex. 2 at 4:06–07.) Both Officers again told him to stop. (DSOF Ex. 2 at 4:04–10.) He continued to slowly move toward her. (DSOF Ex. 2 at 4:06–09.) Officer Smith-Petersen moved backwards in response. (DSOF Ex. 2 at 4:06–08; Ex. 3 at 75:9–15.) Plaintiff then appeared to stop next to the front passenger's side of the vehicle. (DSOF Ex. 2 at 4:07–09; DSOF Ex. 3 at 5:38–41.) Officer Smith-Peterson fired a single round, striking Plaintiff in the abdomen. (DSOF Ex. 2 at 4:08–10.)

Plaintiff fell to the ground and dropped the knife. (DSOF Ex. 2 at 4:08–12; DSOF Ex. 1 at 77:5–7.) Officer Smith-Petersen put out a radio call that an officer had been involved in a shooting. (DSOF Ex. 1 at 77:15–19.) She approached Plaintiff and kicked the knife out of his reach. (DSOF Ex. 1 at 77:25–78:3.) Within minutes, numerous other law enforcement officers arrived on the scene. (DSOF Ex. 3 at 6:50–9:10.)

Officers Smith-Petersen and Batway provided additional information about the shooting in deposition testimony. Officer Smith-Petersen testified that at the time she shot Plaintiff, she believed he posed a threat to herself, Officer Batway, and the public because

he did not comply with their instructions to drop the knife and continued to advance forward. (PSOF Ex. 3 at 47:6–23, 67:6–14.) She believed that the situation was not "contained" because the parking lot was a "very open space" and "[a]t any point he could have turned around and ran." (PSOF Ex. 1 at 39:19–41:3.) She confirmed that Plaintiff "did not make any specific sudden changes in movement to elicit me to fire my weapon sooner." (PSOF Ex. 3 at 67:15–17.) She decided to shoot "because I no longer had my barrier as well as Officer Batway never had a barrier." (PSOF Ex. 3 at 67:18–20.)

At the time of the shooting, both Officers carried on their person an "OC spray"—similar to pepper spray—and a taser. (PSOF Ex. 3 at 33:16–18; PSOF Ex. 4 at 19:23–25.) Officer Smith-Petersen testified that she did not believe it was safe to use a taser given the positions they were holding and the open parking lot, which presented "containment problems." (DSOF Ex. 1 at 44:14–46:24.) Officer Batway testified that she did not feel it would be effective for her to use pepper spray or a taser given the distance between her and Plaintiff. (DSOF Ex. 4 at 22:15–25.) Prior to the shooting, Officer Batway had called for backup and knew additional units were on their way. (PSOF Ex. 4 at 27:17–21.) She testified she would have felt more comfortable if there had been more officers on the scene, which might have allowed them to use less lethal options. (PSOF Ex. 4 at 28:19–29:19.) Both Officers testified they might have been able to call for crisis-intervention units if there had been more time or additional officers. (PSOF Ex. 3 at 53:17–21; Ex. 4 at 42:20–43:20.)

Both Officers testified that they did not have any prior use of force issues. (DSOF Ex. 1 at 17:4–8; Ex. 4 at 4:19–5:3.) Officer Batway had never been disciplined. (DSOF Ex. 4 at 4:19–5:3.) Officer Smith-Petersen had twice received communications critical of her performance, neither of which involved the use of force. (DSOF Ex. 1 at 15:8–16:6.)

Plaintiff survived his injuries and subsequently brought suit against the Officers and the City. Plaintiff filed the operative Complaint in Maricopa County Superior Court on November 5, 2020. (Doc. 1-3, "Compl.") Defendants thereafter removed the case to this Court. (Doc. 1.) Plaintiff's Complaint raises four claims for relief: state-law claims for assault and battery (Count One) and negligence and gross negligence (Count Two) against

the Officers and the City; a state-law claim for negligent hiring, training, supervision, and retention against the City (Count Three); and a Fourth Amendment claim under 42 U.S.C. § 1983 ("Section 1983") against Officer Smith-Petersen (Count Four). (Compl. ¶¶ 22–60.)

Defendants move for summary judgment on each of Plaintiff's claims. Defendants argue that summary judgment is required on Plaintiff's Section 1983 claim because Officer Smith-Petersen did not use excessive force and, even if she did, she is protected by the doctrine of qualified immunity. (MSJ at 2.) Defendants argue that Plaintiff's state-law claims are subject to qualified immunity under Arizona law. (*Id.*) Finally, Defendants argue that Plaintiff's claims against the City fail because the Officers were not negligent and the City properly trained, hired, and supervised them. (*Id.*)

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

*Co.'s*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id*. at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.") (citation omitted).

### III. ANALYSIS

#### A. Section 1983 Claim

The Court first addresses Plaintiff's Section 1983 claim. "The purpose of 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Est. of Aguirre v. County of Riverside*, 29 F.4th 624, 627 (9th Cir. 2022) (quotation marks and citation omitted). Here, Plaintiff alleges that Officer Smith-Petersen used excessive force, depriving him of his Fourth Amendment right to be free from unreasonable seizure. (Compl. ¶¶ 58–60.) Defendants move to dismiss Plaintiff's claim on two grounds. They argue that Officer Smith-Petersen's use of force was objectively reasonable as a matter of law and that she is entitled to qualified immunity in any event. (MSJ at 7–14.)

Qualified immunity is a judicially created doctrine. *See Aguirre*, 29 F.4th at 627. The Ninth Circuit recently instructed that the doctrine "'acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.' As the architects of qualified

immunity, courts must ensure that the doctrine remains tethered to this principle." *Id.* (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). Determining whether qualified immunity shields a government official from civil liability under Section 1983 is a two-prong inquiry. The Court must consider: "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Id.* The Court has discretion as to which prong of the analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 235 (2009).

The grounds for dismissal asserted by Defendants track the two prongs of the qualified immunity analysis. That is, if a reasonable jury could find that Officer Smith-Petersen used excessive force in violation of Plaintiff's right to be free from unreasonable seizure, her entitlement to summary judgment turns on whether the law was "sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The Court considers Defendants' arguments in turn.

### 1. The Constitutional Violation

It is undisputed that Officer Smith-Petersen used deadly force, which unquestionably constitutes "a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment's reasonableness standard is an objective one. Determining whether an officer's use of force was objectively reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (quoting *Garner*, 471 U.S. at 8). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* It therefore "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

. . . .

1    "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*,
2  471 U.S. at 9. In *Graham*, the Supreme Court identified three non-exhaustive factors to
3  consider in evaluating the strength of the government's interests in using such force: (1)
4  "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to
5  the safety of the officers or others"; and (3) "whether he is actively resisting arrest or
6  attempting to evade arrest by flight." 490 U.S. at 396. The Ninth Circuit also has considered
7  factors including (4) "the availability of less intrusive alternatives to the force employed";
8  (5) "whether proper warnings were given"; and (6) "whether it should have been apparent
9  to the officers that the person they used force against was emotionally disturbed." *Isayeva*
10 *v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017). The "most important"
11 factor is the second: whether the suspect posed an immediate threat to the safety of the
12 officers or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

13   When considering qualified immunity, the Court is "limited to considering what
14 facts the officer could have known at the time of the incident." *Est. of Lopez v. Gelhaus*,
15 871 F.3d 998, 1006 (9th Cir. 2017), *cert denied*, 138 S. Ct. 2680 (2018). Consistent with
16 summary judgment standards, the Court must view the evidence in the light most favorable
17 to Plaintiff and resolve genuine factual disputes in his favor. *See id*. at 1006–10.

18   Many of the relevant facts are undisputed. For example, there is no genuine dispute
19 that Officers Smith-Petersen and Batway were responding to reports of an attempted armed
20 robbery with a knife; when they arrived on the scene, the Officers saw Plaintiff walking
21 through the parking lot with a knife; Plaintiff held the knife against his own throat and did
22 not point it at the Officers; Plaintiff did not verbally threaten to harm the Officers; the
23 Officers ordered Plaintiff to stop and/or drop the knife approximately twenty times, but he
24 refused to do so; both Officers had tasers and pepper spray, which they did not employ;
25 Officer Smith-Petersen warned Plaintiff that she would shoot him if he came any closer;
26 Plaintiff repeatedly told the Officers that he wanted them to shoot him; approximately one
27 minute into the encounter, Plaintiff slowly began advancing toward Officer Smith-
28 Petersen; the Officers told him to stop, which he did; approximately one minute later,

1    Plaintiff began moving toward Officer Smith-Petersen again, breaking her cover; the
2    Officers repeatedly told him to stop and he said, "Go ahead man, go ahead, man"; and
3    Officer Smith-Petersen then shot him. (DSOF ¶¶ 1–2, 6, 10, 14, 16–17, 20–21, 24–25, 29,
4    32–33, 35, 38–40, 43; PSOF ¶¶ 1–2, 6, 10, 14, 16–17, 20–21, 24–25, 29, 32–33, 35, 38–
5    40, 43, 68–69, 72, 87; *see generally* DSOF Ex. 2 at 1:50–4:15; Ex. 5 at 3:30–5:45.)

6            There are genuine disputes as to other relevant facts. First, the parties dispute
7    whether Plaintiff stopped moving toward Officer Smith-Petersen immediately prior to her
8    shooting him. (PSOF ¶ 41; Reply at 2 n.2.) A jury reasonably could conclude from the
9    body-worn-camera footage that he did stop. (*See* DSOF Ex. 2 at 4:01–4:08; DSOF Ex. 3 at
10   5:36–42.) Second, there is a genuine dispute as to whether Officer Smith-Petersen safely
11   could have moved her position relative to Plaintiff to maintain cover and/or the distance
12   between them. (Resp. at 2–3; Reply at 2–3.) Officer Smith-Petersen plausibly explained
13   that she could not have done so, but it would not be irrational for a jury to find that she
14   could have moved at least some distance, as she had done at various points during the
15   encounter. (*See, e.g.*, DSOF Ex. 2 at 2:05–14, 4:00–10; PSOF Ex. 3 at 31:24–32:13, 62:4–
16   64:25; Ex. 4 at 35:6–36:16.) Third, there is a genuine dispute as to whether the Officers
17   could have used less-lethal options, such as a taser. (MSJ at 10–11; Resp. at 9–11.) The
18   Officers plausibly explained why they could not have used a taser given their positions and
19   the lack of containment, but their explanations are not indisputable. The parties' use-of-
20   force experts disagree on this question. (PSOF Ex. 1 at 25–26; DSOF Ex. 9 at 15.)[3] Fourth,
21   there is a genuine dispute about the extent to which Plaintiff's movements toward Officer
22   Smith-Petersen were threatening. Officer Smith-Petersen testified that Plaintiff disobeying
23   her commands to drop the knife and advancing toward her suggested to her that he intended

---

[3] Defendants' Partial *Daubert* Motion regarding Plaintiff's expert, Roger Clark, challenges the statement in Mr. Clark's report that "there were far more reasonable and obvious less than lethal force options available besides shooting Mr. Singh." (Doc. 46 at 10.) Defendants contend that this statement is inconsistent with the Officers' testimony. (*See id*.) But Defendants do not proffer a compelling reason why expert testimony on this issue would be improper. *Cf. S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (finding a genuine factual dispute as to the availability of less-lethal alternatives where plaintiff's expert described less-lethal alternatives as "obvious," but defendants contended for various reasons that such alternatives were not practical). Indeed, Defendants' own expert opined in his report about the availability of less-lethal alternatives. (*See* DSOF Ex. 9 at 15.)

to harm her. (DSOF Ex. 1 at 47:6–23.) However, she acknowledged that Plaintiff "did not make any specific sudden changes in movement to elicit me to fire my weapon sooner." (PSOF Ex. 3 at 67:6–20.) Plaintiff maintains that he made no movements or gestures indicating that he intended harm to anyone, but himself. (PSOF ¶ 44.) This presents a difficult question, but the Court finds that it is one properly reserved for a jury as it weighs the evidence and the reasonable inferences to be drawn from the evidence.

Construing the evidence in Plaintiff's favor, as it must, the Court now applies the *Graham* factors, and other factors identified by the Ninth Circuit, to consider whether Officer Smith-Petersen's use of deadly force was objectively reasonable as a matter of law.

### a. Severity of the crime

The Ninth Circuit has applied the first *Graham* factor in "two slightly different ways." *Browder*, 929 F.3d at 1136. First, the Ninth Circuit has held that "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." *Id*. Second, the court has used the severity of the crime as a proxy for the second *Graham* factor: the danger that a suspect poses at the time force is applied. *Id*.

Officers Smith-Petersen and Batway were responding to reports of an attempted armed robbery, a felony. *See* A.R.S. §§ 13-1904(B), 13-1001(C)(2). The Ninth Circuit has observed that armed robbery is "a serious crime that poses an obvious risk of violence," which "suggests that the government *may* have an interest in using force to effect an arrest." *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022) (emphasis in original). Here, the Officers reasonably concluded that Plaintiff was the suspect in the reported attempted robbery. However, it is not clear that Plaintiff was engaged in that crime when the officers arrived, let alone when Officer Smith-Petersen shot him—a factor the Ninth Circuit has recognized as one the jury can consider in assessing deadly force. *See Browder*, 929 F.3d at 1136 (holding that even if the decedent previously had made felonious threats or committed a serious crime, a jury could find that these crimes did not render the use of deadly force reasonable because he was "indisputably not engaged in any such conduct"

when the officer shot him); *see also Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) ("[T]he fact that [the suspect] had committed a violent crime in the immediate past is an important factor but it is not, without more, a justification for killing him on sight.").

Second, Defendants contend that during the confrontation, "Plaintiff refused to obey commands, brandished a knife, and repeatedly moved towards Officer Smith-Petersen on at least three occasions"—actions that "clearly constitute attempted or completed dangerous felonies under Arizona law." (MSJ at 8 (citing A.R.S. §§ 13-1202 (threatening or intimidating), 13-1204 (aggravated assault with a deadly weapon), 13-2508 (resisting arrest)).) The success of these arguments rests, at least in part, on disputed facts. As noted, Plaintiff did not verbally threaten to harm the Officers. Further, as noted, a jury reasonably could conclude that Plaintiff's movements and gestures indicated an intent to harm only himself. A jury also could conclude that Plaintiff's efforts to resist arrest only amounted to "passive resistance," a misdemeanor. *See* A.R.S § 13-2508. In short, a jury could conclude that the severity of any crimes that Plaintiff previously had committed or was committing during the encounter did not, in and of itself, justify the use of deadly force against him. *See Browder*, 929 F.3d at 1136.

### b.      Immediate Threat to Officers or the Public

The next *Graham* factor is the most important: whether Plaintiff posed an immediate threat to the Officers or the public. *Mattos*, 661 F.3d at 441. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "Rather, the objective facts must indicate that the suspect poses an *immediate* threat to the officer[s] or a member of the public." *Id.* (emphasis added); *see Browder*, 929 F.3d at 1133 ("The use of deadly force is only reasonable if a suspect 'poses a *significant* threat of death or serious physical injury to the officer or others.'" (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014)). Here, it cannot be disputed that Plaintiff created a potentially dangerous situation for the Officers and the public. On this record, however, the Court finds that the question of whether or not Plaintiff

posed an immediate threat to the Officers or the public is properly reserved for a jury. This conclusion is supported by comparing the facts of this case—including the genuinely disputed facts resolved in Plaintiff's favor—to cases cited by Defendants. (*See* MSJ at 9.)

In *Gonzales v. City of Antioch*, the Ninth Circuit affirmed summary judgment in favor of a city on negligence and battery claims arising from a fatal police shooting. 697 F. App'x 900 (9th Cir. 2017). The undisputed evidence showed that the decedent had contacted the police and "repeatedly made statements from which it could be inferred that he was planning to kill a police officer"; refused to drop the gun he was carrying when ordered to do so by officers who subsequently arrived at his house; and momentarily raised his gun in the officers' direction as he retreated toward his garage. *Id*. at 901–02. The Ninth Circuit held that the fact that the decedent "only momentarily raised his gun and then lowered it as he was retreating . . . d[id] not create a genuine factual dispute as to whether the force used was reasonable." *Id*. Where "the responding officers were confronted with a suspect who had repeatedly threatened to kill a police officer and raised his gun in the direction of the officers," the use of deadly force was reasonable as a matter of law. *Id*.

In *Smith v. City of Hemet*, the Ninth Circuit held that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." 394 F.3d 689, 704 (9th Cir. 2005). The court cited several examples: violently resisting arrest, physically attacking an officer, and grabbing the officer's gun, *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002); swinging a knife at an officer after behaving erratically, *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996); pointing a gun at officers, *Scott v. Henrich*, 39 F.3d 912, 914–15 (9th Cir. 1994); and attacking an agent with a rock and stick, *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987). Later, in *George v. Morris*, the Ninth Circuit recognized that officers do not necessarily have "to delay their fire until a suspect turns his weapon on them. If the person is armed— or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." 736 F.3d 829, 838 (9th Cir. 2013).

1  Here, Plaintiff did not verbally threaten the Officers. Nor did he "make any specific sudden changes in movement to elicit [Officer Smith-Petersen] to fire [her] weapon." (PSOF Ex. 3 at 67:6–20.) Moreover, as noted, it would not be irrational for a jury to conclude that Plaintiff's conduct indicated an intent to harm only himself, and that his movements were not "furtive," nor his gestures "harrowing." *Morris*, 736 F.3d at 838. As noted, a jury also could find that Plaintiff stopped at the corner of the patrol vehicle immediately before Officer Smith-Petersen shot him, possibly diminishing the immediacy of any threat he posed to her safety. As noted, a jury also could find that Officer Smith-Petersen safely could have moved, at least some distance. As to any threat to the public, "a jury could conclude that no one was close enough to [Plaintiff] to be harmed by him before police could intervene." *Glenn v. Washington County*, 673 F.3d 864, 874 (9th Cir. 2011).

**c.  Resisting Arrest or Attempting to Escape**

The third *Graham* factor asks "whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Mattos*, 661 F.3d at 441. Defendants correctly note that "Plaintiff indisputably failed to heed 20+ officer commands to relinquish and lower his weapon so the deputies could control him." (MSJ at 10.) In response, Plaintiff cites *Hayes v. County of San Diego*, in which the Ninth Circuit found no evidence that the decedent, who was holding a knife when an officer shot him, was actively resisting, or attempting to evade, arrest. 736 F.3d 1223, 1233 (9th Cir. 2013). *Hayes* is distinguishable. Among other things, the decedent in *Hayes* complied with the only command the officers gave him: to show his hands. *Id.* at 1228. Here, Plaintiff indisputably refused to comply with the Officer's commands. Nonetheless, the jury could consider whether Plaintiff's resistance was "passive" or "active," a distinction the Ninth Circuit has identified as relevant. *See, e.g.*, *Glenn*, 673 F.3d at 874–85 (holding that the third *Graham* factor did not support force used where "the crux of the resistance was the refusal to follow officers' commands, rather than actively attacking or threatening officers or others").

. . . .

. . . .

### d. Additional Relevant Factors and Summation

The parties discuss two additional factors that the Ninth Circuit has considered as relevant: the availability of less intrusive alternatives to the force used; and "whether it should have been apparent to the officers that the person they used force against was emotionally disturbed." *Isayeva*, 872 F.3d at 947. (*See* MSJ at 10–11; Resp. at 9–12.)[4]

As discussed, there are genuine factual disputes as to whether Officer Smith-Petersen safely could have moved, at least some distance, and whether the Officers could have employed less lethal options. The Officers were not constitutionally obligated "to employ the least intrusive means available so long as they act[ed] within a range of reasonable conduct." *Glenn*, 673 F.3d at 877–78. However, the jury still could consider the availability of less lethal alternatives—for example, the tasers the Officers carried on their persons—in assessing whether deadly force was justified. *See id.* Similarly, the jury could consider Plaintiff's mental or emotional disturbance. Defendants do not seriously dispute this, but maintain that it is not dispositive. (Reply at 8–9.) This point is well taken; "the fact that [Plaintiff] was intent on 'suicide by cop' did not mean that the officers had to endanger their own lives." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014).

Unlike in *Lal*, however, the Court cannot conclude that Officer Smith-Petersen's use of deadly force was reasonable as a matter of law. *See id.* at 1115–19. "Because the disputed facts and inferences could support a verdict for either party," Officer Smith-Petersen is not entitled to summary judgment on this ground. *Glenn*, 673 F.3d at 878. For Plaintiff to overcome qualified immunity, however, it must have been "clearly established" that Officer Smith-Petersen's use of force violated Plaintiff's Fourth Amendment right.

### 2. Whether The Right Was "Clearly Established"

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Mullenix*, 577 U.S. at 11. Although the Supreme Court has not required "a case directly on point for

---

[4] Defendants do not press the point, but the Ninth Circuit has also considered whether adequate warnings were given, *see Isayeva*, 872 F.3d at 947, which they indisputably were here.

a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Cortesluna*, 142 S. Ct. at 8. "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004)).

As noted, the Supreme Court more than three decades ago set forth the standards governing the use of deadly force. *See Graham*, 490 U.S. at 396; *Garner*, 471 U.S. at 11. In an "obvious case," these standards can "clearly establish" that a reasonable officer would have understood that what he or she is doing violates the Fourth Amendment, "even without a body of relevant case law." *Brousseau*, 543 U.S. at 199. As the foregoing analysis shows, this is not an obvious case. Thus, to show a violation of clearly established law, Plaintiff must identify a case that put Officer Smith-Petersen on notice that the use of deadly force in these circumstances was unreasonable. *See Cortesluna*, 142 S. Ct. at 8. Plaintiff identifies several cases he contends provided such notice. (*See* Resp. at 1–15.)

In *George v. Morris*, the Ninth Circuit held that it was unconstitutional for officers to fatally shoot a terminally ill man who emerged from his home onto his porch with both a walker and a gun. 736 F.3d at 832–33. Most relevant here, it was genuinely disputed in *Morris* whether the decedent made any "furtive movement, harrowing gesture, or serious verbal threat." *Id*. at 838. There, however, the "core" factual dispute was whether the decedent manipulated the gun or pointed it at the officers. *See id*. at 833 & n.4, 838–39. Here, the crux is not about what movements and gestures Plaintiff made—which are disputed but, to a large extent, evident from the video footage—but whether they would cause a reasonable officer to view him as an immediate threat given his erratic behavior.

In *Hughes v. Kisela*, officers responded to a "check welfare" call regarding a person with a knife who was acting erratically. 862 F.3d 775, 778 (9th Cir. 2016). When officers arrived, they saw a woman carrying a large kitchen knife. *Id*. When she began to walk toward another woman, the police yelled for her to drop the knife, which she did not do. *Id*. Unable to get any closer to intervene and prevent the perceived threat to the other woman, an officer shot the woman with the knife. *Id*. The Ninth Circuit held that, viewing

the facts in the light most favorable to the decedent, the record did not support the officer's perception of an immediate threat to the other woman. *Id*. at 780. The Ninth Circuit also held that it was clearly established under prior case law that the officer's conduct was unconstitutional. *Id*. at 782–85. The Supreme Court reversed the latter holding. 138. S. Ct. 1148, 1153–55 (2018). Whether or not the former holding remains good law—which the Supreme Court deemed a "proposition that is not at all evident," *id*.—it is distinguishable. Most importantly, *Hughes* did not involve a perceived threat to the officer's own safety.

The same is true of *Glenn v. Washington County*. There, officers responded to the scene of a suicidal young man with a knife acting erratically. 673 F.3d at 867. When the officers arrived at the home, the young man was holding the knife to his own throat. *Id*. at 868. After he did not comply with their instructions to drop the knife, an officer shot him with a beanbag shotgun; after he then started moving towards the home, officers fatally shot him with live rounds. *Id*. at 869. The Ninth Circuit reversed the district court's grant of summary judgment in favor of the officers, concluding that "the officers' use of force was not undisputably reasonable." *Id*. at 872. There are important distinctions in the circumstances in which Officer Smith-Petersen shot Plaintiff. For one, the officers in *Glenn* were responding to a domestic disturbance and there was no indication that the decedent previously had threatened another person. *See id*. at 867, 873. Here, by contrast, dispatch relayed to the Officers that a suspect had tried to rob someone with a knife. They saw Plaintiff with a knife in the parking lot soon after. More importantly, unlike Plaintiff, the decedent in *Glenn* did not make movements toward the officers. *See id*. at 869.

In *Hayes*, the Ninth Circuit held that officers used excessive force when they fatally shot a man after encountering him inside his girlfriend's home with a large knife. 736 F.3d at 1227–28. The officers were responding to a domestic disturbance call in which the decedent's girlfriend had raised concerns that he was suicidal. *Id*. at 1227. When officers searched the house, they saw the decedent in a kitchen area and ordered him to show his hands. *Id*. "While taking one step towards [one of the officers], [the decedent] raised both his hands to approximately shoulder level, revealing a large knife pointed tip down in his

right hand." *Id*. at 1228. Perceiving a threat, the officer shot him. *Id*. Applying *Graham*, the Ninth Circuit considered that there was no evidence that the decedent had committed a crime; the decedent "had followed all orders from the deputies at the time he was shot,"; and he "had not been told to stop, nor had he been given any indication that his actions were perceived as a threat." *Id*. at 1233–34. Each of those factors is distinguishable here.

The remaining cases cited by Plaintiff are likewise distinguishable. In *Vos v. City of Newport Beach*, officers fatally shot a man who had been behaving erratically in a 7-Eleven store, including reportedly cutting someone with scissors, when the man charged at the officers with something in his upraised hand. 892 F.3d 1024, 1028–30 (9th Cir. 2018). Unlike here, the officers in *Vos* already had less-lethal methods ready to employ, including a 40-millimeter less-lethal weapon, a canine unit, and tasers. *Id*. at 1032–34. In *S.B. v. County of San Diego*, the Ninth Circuit held that a jury could conclude that officers acted unreasonably when they fatally shot a man who was grabbing a knife from his pocket while on his knees. 864 F.3d 1010, 1011–12 (9th Cir. 2017). Unlike here, the jury in *S.B.* also could have concluded the officers never ordered the decedent to drop the knife or warned him he was about to be shot. *Id*. There are many distinctions between this case and *Lopez v. Gelhaus*, including that the officers there only indisputably gave one command for the decedent—a thirteen-year-old holding a toy gun while walking down the road—to drop his weapon before shooting him. 871 F.3d at 1001. Similarly, in *C.V. v. City of Anaheim*, the jury could have concluded that the decedent was complying with the officers' instructions before they fatally shot him. 823 F.3d 1252, 1256 (9th Cir. 2016). Finally, Plaintiff cites cases standing for the proposition that officers may not use deadly force merely because a subject is armed. (*See e.g.*, Resp. at 4 (citing *Glenn*, 673 F.3d at 872–73), and 14 (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324–25 (9th Cir. 1991)).) This proposition is too generalized to provide sufficient notice of the bounds of reasonableness here.

In sum, while a reasonable jury could conclude that Officer Smith-Petersen's use of deadly force against Plaintiff was unreasonable, existing law did not place that conclusion

1  "beyond debate." *Cortesluna*, 142 S. Ct. at 8. Officer Smith-Petersen therefore is entitled
2  to qualified immunity and, thus, summary judgment on Plaintiff's Section 1983 claim.

### B. State-Law Claims

Defendants move for summary judgment on the remainder of Plaintiff's state-law claims. (MSJ at 14–20.) There is a threshold question: whether the Court should continue to exercise jurisdiction over Plaintiff's state-law claims in light of its above ruling disposing of Plaintiff's federal claim. As noted, Plaintiff initially filed this action in Maricopa County Superior Court. (*See* Doc. 1, Notice of Removal, ¶ 1.) Defendants thereafter removed the case to this Court, invoking the Court's jurisdiction under 28 U.S.C. §§ 1331, 1367, 1441, and 1446. (*Id.* ¶¶ 6–8.) The sole basis for removal asserted by Defendants was this Court's original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's federal claim, and its supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims arising from the same case or controversy. (*See id.*) In light of the Court's above ruling, the Court no longer retains federal question jurisdiction.

The Court therefore has discretion to decline to exercise jurisdiction over Plaintiff's remaining state-law laws. *See* 28 U.S.C. § 1367(c)(3). The Supreme Court has recognized "that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ.*, 484 U.S. 343, 350 n.7 (1988); *accord Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). While the Court is mindful that declining to exercise jurisdiction is often the appropriate course under these circumstances, the Court highlights two particularly important factors informing its decision to do so in this case. First, Plaintiff initially filed this case in state court, to which the case will be remanded, and he therefore will not be prejudiced.

Second, the parties here dispute several questions of state law, including a question with respect to which courts in this district have come to apparently orthogonal conclusions: whether the common-law-qualified-immunity doctrine set forth in *Spooner v.*

*City of Phoenix*, 435 P.3d 462 (Ariz. Ct. App. 2018), applies to torts other than simple negligence. *See, e.g.*, *Hamberlain v. Arizona*, No. CV-18-03624-PHX-DLR, 2021 WL 2805628, at *5 (D. Ariz. July 6, 2021) (noting that "[t]his District has since construed *Spooner* as applying only to cases of simple negligence, as opposed to gross negligence" and finding no authority extending *Spooner* to torts of invasion of privacy, conversion, trespass to chattels, trespass to land, gross negligence, or intentional infliction of emotional distress) (citing *Merritt v. Arizona*, 425 F. Supp. 3d 1201 (D. Ariz. 2019)); *Johari v. City of Tempe*, No. CV-17-00095-PHX-ROS, 2019 WL 4451348, at *8 (D. Ariz. Sept. 17, 2019) (applying *Spooner* to malicious prosecution claims); *Krause v. County of Mohave*, No. CV-17-08185-PCT-SMB, 2020 WL 2541728, at *16 (D. Ariz. May 19, 2020) (applying common law qualified immunity recognized in *Spooner* to wrongful death, negligence and battery claims). The principle of comity favors the resolution of these questions by Arizona courts. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

**IT IS THEREFORE ORDERED** granting in part Defendants' Motion for Summary Judgment (Doc. 52). Defendant Smith-Petersen is entitled to qualified immunity on Plaintiff's claim under the Fourth Amendment and 42 U.S.C. § 1983 (Count Four). Count Four therefore is dismissed. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims (Counts One, Two, and Three) and therefore remands this case to the Maricopa County Superior Court for resolution of those claims.

**IT IS FURTHER ORDERED** denying Defendants' Partial *Daubert* Motion Re: Roger Clark (Doc. 46) without prejudice to refiling in state court on remand.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to remand this case to the Maricopa County Superior Court and close this matter.

Dated this 23rd day of February, 2023.

Honorable John J. Tuchi
United States District Judge