**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Krish Singh,<br><br>            Plaintiff,<br><br>v.<br><br>City of Phoenix, *et al.*,<br><br>            Defendants. | No. CV-21-00099-PHX-JJT<br><br>**ORDER** |

At issue are two motions by Defendants, the City of Phoenix ("the City") and Phoenix Police Department Officers Brittany Smith-Petersen and Annie Batway ("the Officers"). The Court previously declined to adjudicate certain aspects of these motions in light of the Court's determination that Officer Smith-Petersen possessed qualified immunity regarding Plaintiff Krish Singh's claim under 42 U.S.C. § 1983. (*See* Doc. 73.) Now, following the Ninth Circuit's reversal of the qualified-immunity decision and remand of the case for further proceedings, *see Singh v. City of Phoenix*, 124 F.4th 746 (9th Cir. 2024), the Court must dispose of the newly revived motions. Specifically, the Court must consider the residual portion of Defendants' Motion for Summary Judgment (Doc. 52, MSJ), as well as Defendants' *Daubert* Motion regarding Plaintiff's use-of-force expert (Doc. 46, *Daubert* Motion). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, it grants in part and denies in part each of Defendants' motions.

## I. Background

This lawsuit arises out of an incident that took place on November 11, 2019, in which Officer Smith-Petersen shot and injured Plaintiff during a law-enforcement encounter. Plaintiff sued Defendants on four claims: (1) assault and battery under Arizona common law against Officer Smith-Petersen, for which Plaintiff asserts the City is vicariously liable;[1] (2) negligence and gross negligence under Arizona law against both Officers, for which Plaintiff asserts the City is vicariously liable; (3) negligent hiring, training, supervision, and retention under Arizona law against the City; and (4) violation of Fourth Amendment civil rights under 42 U.S.C. § 1983 against Officer Smith-Petersen. (Doc. 1-3 at 4–9; Doc. 85-1 Ex. 1, Complaint at 4–9.) In its prior Order, the Court concluded that Officer Smith-Petersen was entitled to qualified immunity regarding the § 1983 claim. (Doc. 73 at 19.) Given that the Court's subject matter jurisdiction over this case is predicated upon the existence of a federal question, the Court concluded that judicial comity weighed against retaining supplemental jurisdiction over the three state-law claims following dismissal of the § 1983 claim. The Court therefore remanded the case to state court without passing upon the portions of Defendants' motion for summary judgment that addressed the state-law claims. (Doc. 73 at 20.) For the same reason, the Court declined to adjudicate Defendants' *Daubert* motion. Plaintiff appealed to the Ninth Circuit, and the Maricopa County Superior Court stayed the remanded proceeding during the pendency of Plaintiff's appeal. (*See* Doc. 85-1 at 60.)

In determining whether qualified immunity shielded Officer Smith-Petersen from civil damages, the Court assessed (1) whether Plaintiff had shown that the Officer violated a constitutional right and (2) whether that constitutional right was clearly established at the

---

[1] Although Plaintiff styles this single claim as a claim for "assault and battery," the Court will refer to the claim as a battery claim, as the allegedly harmful touching was consummated, not merely threatened. *See Gallegos v. Flores*, No. 1 CA-CV 10-0178, 2012 WL 208858, at *3 ¶ 11 (Ariz. Ct. App. Jan. 24, 2012) ("The two claims are the same except that assault does not require the offensive touching or contact."). Had Plaintiff directed this claim against Officer Smith-Petersen *and* Officer Batway, there may have been cause to conduct an assault inquiry. However, as Plaintiff brings this claim solely against Officer Smith-Petersen, who consummated her allegedly wrongful touching of Plaintiff, the asserted assault is subsumed into the asserted battery. (*See* Complaint ¶¶ 22–29.)

time of the alleged misconduct. The Ninth Circuit affirmed this Court's first-prong finding that "Plaintiff has established a plausible, even though not conclusive, constitutional violation at step one of the qualified-immunity analysis." *Singh*, 124 F.4th at 750. However, the Ninth Circuit reversed the Court's second-prong ruling, holding instead that a 2011 opinion "put Smith-Petersen on notice that her use of deadly force plausibly violated Plaintiff's Fourth Amendment right to be free of excessive force." *Singh*, 124 F.4th at 750 (citing *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)). Thus, the Ninth Circuit "reverse[d] the district court's grant of summary judgment to Defendant Smtih-Petersen [sic] with respect to Plaintiff's § 1983 claim, reverse[d] the dismissal of the state-law claims, and remand[ed] for further proceedings on the § 1983 claim and for reconsideration of whether to exercise supplemental jurisdiction over the state-law claims." *Id.* at 756. The Court has determined to exercise supplemental jurisdiction over Plaintiff's state-law claims, and Plaintiff has duly re-removed those claims from state court. (*See* Doc. 85.)

As noted, the Ninth Circuit's remand revived the portion of Defendants' motion for summary judgment that addressed Plaintiff's state law claims. Plaintiff previously filed a Response in opposition (Doc. 68, MSJ Response), and Defendants previously filed a Reply in support (Doc. 72, MSJ Reply). Following the Ninth Circuit's remand, the parties filed limited supplemental memoranda supporting their respective positions on the summary judgment motion. (*See* Doc. 88; Doc. 89.) However, the parties did not supplementally brief Defendants' *Daubert* motion. (*See* Doc. 87.) Thus, the briefing on that motion is limited to Plaintiff's Response in opposition (Doc. 61, *Daubert* Response) and Defendants' Reply in support (Doc. 67, *Daubert* Reply).

Both this Court and the Ninth Circuit have described the facts of the shooting incident in great detail, (*see* Doc. 73 at 2–5; *Singh*, 124 F.4th at 748–49), and there is no need to recapitulate that description here. However, neither this Court nor the Ninth Circuit has previously addressed the facts pertaining to Plaintiff's claim against the City for negligent hiring, training, supervision, and retention of Officers Smith-Petersen and Batway. Such explication is unnecessary, though, as Plaintiff has abandoned his claim of

direct City negligence. In their motion for summary judgment, Defendants dedicated three pages to their argument that the City did not negligently hire, train, supervise, or retain Officers Smith-Petersen and Batway. (*See* MSJ at 17–20.) Defendants also cited extensively to their statement of facts. (*See* MSJ at 6–7.) In his Response, Plaintiff did not dedicate a single word to rebuffing Defendants' argument, nor did Plaintiff dispute any fact relating to this claim. In their Reply, Defendants expressly contended that Plaintiff had abandoned the claim of direct City negligence. (MSJ Reply at 17.) Critically, Plaintiff again did not dedicate a single word of his supplemental brief to this claim, despite utilizing only two of the ten pages afforded him by the Court. Nor did Plaintiff contest Defendants' assertion of abandonment. The Court therefore concludes that Plaintiff has abandoned his claim of direct City negligence, and the Court will award summary judgment to Defendants thereon. *See Blackshire v. County of Yuba*, 648 F. Supp. 3d 1221, 1237 (E.D. Cal. 2023) ("On a motion for summary judgment, the plaintiff's failure to address a claim serves as the plaintiff abandoning that claim."). The Court now turns to the analysis of Plaintiff's other two state-law claims, as well as Defendants' *Daubert* motion.

## II.     The Summary Judgment Motion

### A.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

**B.      Discussion**

Defendants present several arguments in support of their motion for summary judgment with respect to Plaintiff's claims of negligence, gross negligence, and battery. Some of Defendants' contentions are claim-specific, and some are general. The Court addresses the latter first.

. . .

. . .

### 1. Qualified Immunity Under Arizona Common Law

Defendants argue that Officers Smith-Petersen and Batway are entitled to state-law qualified immunity with respect to all of Plaintiff's state-law claims. (MSJ at 14–15.) Under Arizona common law, police officers and other public officials possess qualified immunity from lawsuits pertaining to actions that inherently require judgment or discretion. *Spooner v. City of Phoenix*, 246 Ariz. 119, 123–24 ¶ 9 (Ct. App. 2018). However, Arizona's doctrine of qualified immunity does not extend to situations in which a public official "knew or should have known that [s]he was acting in violation of established law or acted in reckless disregard of whether h[er] activities would deprive another person of their rights," even if such action was a discretionary act that she undertook within the scope of her public duties. *Id.* ¶ 10 (quoting *Chamberlain v. Mathis*, 151 Ariz. 551, 558 (1986)). The *Spooner* court went on to illustrate this concept by stating that "[a] public official's conscious disregard of the law or the rights of others constitutes gross negligence, and she remains liable for such conduct, [b]ut a public official performing a discretionary act encompassed within her public duties is shielded from liability for simple negligence." *Id.* (internal citations omitted).

As noted, Plaintiff's remaining state-law claims are negligence, gross negligence, and battery. Plaintiff's negligence claim is plainly barred by Arizona's doctrine of qualified immunity, as the doctrine is expressly aimed at precluding a public official's liability for simple negligence. *See Spooner*, 246 Ariz. at 123–24 ¶¶ 9–10. The Court therefore grants summary judgment to Defendants on this claim.

It is equally plain, however, that Arizona's doctrine of qualified immunity does not extend to Plaintiff's gross-negligence claim. *See Spooner*, 246 Ariz. at 123–24 ¶¶ 9–10. In supporting their invocation of qualified immunity, Defendants argue that their conduct was not grossly negligent, but the Court rejects this argument as duplicative. If Defendants can demonstrate at the summary-judgment stage that their conduct was, as a matter of law, not grossly negligent, then Plaintiff's gross-negligence claim would fail on the merits, and there would be no need to consider whether Defendants are *also* entitled to qualified

immunity regarding that failed claim. Likewise, if Defendants cannot demonstrate that they are entitled to summary judgment on Plaintiff's gross-negligence claim, then they logically also cannot establish entitlement to qualified immunity, as there would necessarily remain a jury question as to whether the challenged conduct rose to the level of gross negligence.

For similar reasons, Arizona's doctrine of qualified immunity does not bar Plaintiff's claim of battery, which is an intentional tort. In Arizona, the intent required for common-law battery is not a mere generalized intent to complete an action, but is rather a particularized intent to cause harm. *See Ryan v. Napier*, 245 Ariz. 54, 59 ¶ 18 (2018) ("Acting with 'intent' does not refer to the act itself. It means that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it. Thus, as pertinent here, a battery claim requires proof that the defendant intended to cause harmful or offensive contact with the plaintiff." (cleaned up)). Therefore, by definition, a meritorious claim of common-law battery involves a form of intent that precludes an application of state-law qualified immunity. *See Spooner*, 246 Ariz. at 123–24 ¶¶ 9–10.

Thus, the Court finds that Arizona's common-law doctrine of qualified immunity bars Plaintiff's claim of simple negligence, but not his claims of gross negligence or battery. This conclusion is nearly identical to that reached by the *Spooner* court, which affirmed both (1) the trial court's denial of judgment as a matter of law on claims of intentional or grossly negligent misconduct and (2) the trial court's award of judgment as a matter of law on a claim of simple negligence. *See* 246 Ariz. at 124–25 ¶¶ 12. The Court now turns to Defendants' claim-specific arguments in favor of summary judgment.

### 2.     Gross Negligence

Under Arizona law, a plaintiff may not recover under a theory of negligence (and thus also gross negligence) regarding misconduct that was intentional. *Ryan*, 245 Ariz. 54 at 60 ¶ 20 (holding that "negligence and intent are mutually exclusive grounds for liability"). However, the Arizona Supreme Court has recognized that the extent to which a

given fact pattern can support an intentional tort, an unintentional tort, both, or neither is highly fact specific.

> We also disagree with the court of appeals and [the plaintiff] that negligence liability can result from a law enforcement officer's "evaluation" of whether to intentionally use force against another person. A negligence claim requires either "an act" or a failure to "act." An "act" is "an external manifestation of the actor's will." An actor's internal evaluation about whether to use force and the decision to do so are not "acts" and therefore cannot, by themselves, constitute negligence. Here, [the officer's] "act," and the sole cause of [the plaintiff's] injuries, was [the officer's] intentional release of [a police dog] to bite and hold [the plaintiff]. As previously explained, an intentional act cannot also constitute negligence. In short, [the officer's] internal evaluation of whether to release [the dog] and his decision to do so was part and parcel of his intent to inflict harmful or offensive contact on [the plaintiff].
>
> . . . .
>
> To be clear, plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory. For example, if the evidence here also supported a finding that [the officer] unintentionally dropped [the dog's] leash, resulting in the attack against [the plaintiff], a negligence claim would have been appropriate. It is the jury's role (or the judge's in a bench trial) to establish what occurred and then apply the correct legal theory to arrive at a verdict.

*Id.* at 60–62 ¶¶ 22, 31 (internal citations omitted).

Thus, in order to maintain a claim of gross negligence, Plaintiff must show that Officers Smith-Petersen and Batway engaged in grossly negligent conduct independent of the shooting itself. Such conduct must be distinct from Officer Smith-Petersen's intentional decision to discharge her firearm at Plaintiff, as the Arizona Supreme Court has warned against permitting plaintiffs to "plead around" the standards governing intentional torts. *See id.* at 61 ¶ 23.

Plaintiff does not dispute any of the foregoing principles. Instead, Plaintiff contends he has established that Officers Smith-Petersen and Batway engaged in conduct that was both grossly negligent and independent of the shooting. (MSJ Response at 20–24.) In particular, Plaintiff argues that the Officers engaged in grossly negligent behavior by failing to retreat from Plaintiff and use their cars as a barrier, by failing to use their tasers

- 8 -

against Plaintiff, and by failing to call a crisis intervention officer or otherwise employ de-escalation techniques. (MSJ Response at 22; Complaint at 5–7.)[2] Defendants contend that none of the aforementioned acts and omissions are truly independent of Officer Smith-Petersen's subsequent decision to shoot Plaintiff. (MSJ Reply at 14.) Plaintiff supports his assertion of independence by citing to *Garcia v. City of South Tucson*, 131 Ariz. 315, 319 (Ct. App. 1981), in which the Arizona Court of Appeals held that a police sergeant's negligent ordering of an assault on a house at which an officer was already present, without alerting that officer as to the impending assault, could support a cause of action sounding in negligence, thereby implying that the ordering of the assault was an action independent from the subsequent shooting that occurred as part of the assault. Plaintiff's point is well-taken, but the Court need not determine whether or to what extent the present case is analogous to *Garcia*. Even assuming that Officers Smith-Petersen and Batway's pre-shooting conduct was independent from the shooting, such conduct clearly does not rise to the level of gross negligence.

"Gross negligence differs from ordinary negligence in quality and not degree." *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (Ct. App. 1991). "Wanton negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Id.* (quoting *Scott v. Scott*, 75 Ariz. 116, 122 (1953)). No reasonable juror could find the Officers' decisions not to circle their cars, not to tase Plaintiff, and not to call a crisis officer to be *grossly* negligent. Although those actions may carry the veneer of gross negligence when viewed in conjunction with Officer Smith-Petersen's subsequent decision to shoot Plaintiff, that sort of adjudicatory perspective is precisely what Arizona law prohibits. In order for Plaintiff's gross-negligence claim to stand, the pre-shooting conduct of the Officers must be independently grossly negligent, not grossly negligent only when contemplated as part of a larger battery. *Garcia* is instructive here. Although *Garcia* was

---

[2] Plaintiff also contends that Officer Smith-Petersen grossly negligently failed to warn Plaintiff that she might shoot him, (Complaint ¶¶ 42–45), but this averment is plainly contradicted by the record. In any event, such conduct fails to support a claim of gross negligence for the same reasons that apply to the remainder of the Officers' conduct.

- 9 -

decided decades before *Spooner* and therefore did not analyze gross negligence, it nevertheless informs the Court's analysis of this issue. A sergeant's decision to commence an armed assault of a home without warning the officers already on the scene is an order of magnitude more negligent than the pre-shooting conduct alleged by Plaintiff in the instant case. Although the Officers' failure to circle their cars, tase Plaintiff, and call a crisis-intervention specialist may have been negligent, such conduct is not wanton, flagrant, highly potent, or in the air. As Plaintiff's invocation of gross negligence renders the distinction between simple negligence and gross negligence a nullity, the Court must reject Plaintiff's position and award summary judgment to Defendants on the gross-negligence claims.

There thus remain no claims against Officer Batway. Perhaps foreseeing this outcome, Plaintiff asserted for the first time in his Response that Officer Batway is jointly and severally liable for Officer Smith-Petersen's alleged battery because the two were acting in concert. (MSJ Response at 18–19.) Defendants replied that Plaintiff did not bring a claim of battery against Officer Batway and that Plaintiff had never previously sought joint and several liability on the battery claim. (MSJ Reply at 16–17.) Plaintiff's assertion of joint and several liability is cursory at best, as Plaintiff does not explain what the elements of such a finding are or what evidence supports Plaintiff's allegation of concerted action. It must be noted here that joint and several liability is the exception in Arizona, not the rule. *See* A.R.S. § 12-2506 (abolishing joint and several liability but creating an exception where defendants are found to have been "acting in concert," which is defined as "entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort" as limited by the express caveat that "[a] person's conduct that provides substantial assistance to one committing an intentional tort does not constitute acting in concert if the person has not consciously agreed with the other to commit the intentional tort"). Critically, following Defendants' contention that "Plaintiff cannot be allowed to belatedly assert a claim against Officer Batway for assault and battery without amending his Complaint," (*see* MSJ Reply at 16–17), Plaintiff

elected not to provide a response in his supplemental brief, despite using only a small fraction of the allotted page limit. The Court deems this issue conceded and construes Plaintiff as evincing a desire not to amend his Complaint for the purpose of asserting joint and several liability on the battery claim. *See Blackshire*, 648 F. Supp. 3d at 1237 ("On a motion for summary judgment, the plaintiff's failure to address a claim serves as the plaintiff abandoning that claim.").

Moreover, even if Plaintiff were to request leave to amend his Complaint now, such request would likely be fatally dilatory. Discovery has long since concluded, and the Court is not inclined to reopen it. Both the Court's interest in its management of this case and the parties' interest in final justice weigh against regressing to prior stages of the litigation process, particularly as Plaintiff could have sought leave to assert joint and several liability long ago but chose not to do so. As no claims remain against Officer Batway, the Court will dismiss her as a party to this action.

### 3.      Battery

Plaintiff's final state-law claim is a claim of battery against Officer Smith-Petersen, for which he asserts that the City is vicariously liable. (*See* Complaint at 4.) Defendants argue that this claim fails "for the same reasons" that Plaintiff's § 1983 claim fails and that various Arizona statutory defenses applicable to the use of force bar such claim "for the same reasons" that apply to Plaintiff's § 1983 claim. (MSJ at 15.) As the Ninth Circuit has now clarified that those reasons are all unavailing at the summary-judgment stage, the Court must deny summary judgment on the battery claim. It is for the jury to determine both whether Plaintiff has established the elements of this claim and whether any of the statutory defenses to a claim involving a police officer's use of force are available on the facts of this case.

### 4.      Punitive Damages

Finally, Defendants argue that punitive damages are unavailable because Plaintiff has failed to adduce any evidence of an evil motive or of callous indifference. (MSJ at 20.) Plaintiff did not respond to this argument, either in his Response or his supplemental brief,

even after Defendants expressly noted in their Reply that Plaintiff had failed to mount a response in his Response, (*see* MSJ Reply at 17). The Court therefore deems this point conceded and will grant summary judgment to Defendants on the issue of punitive damages. *See Blackshire*, 648 F. Supp. 3d at 1237 ("On a motion for summary judgment, the plaintiff's failure to address a claim serves as the plaintiff abandoning that claim.").

### C. Conclusion

Plaintiff has abandoned his claim against the City for negligent hiring, training, supervision, and retention. The Court therefore awards summary judgment to the City thereon. Plaintiff's negligence claim is barred by Arizona's common-law doctrine of qualified immunity. The Court therefore awards summary judgment to Defendants thereon. Plaintiff's gross-negligence claim fails on the merits. The Court therefore awards summary judgment to Defendants thereon and dismisses Officer Batway as a party. Plaintiff's battery claim against Officer Smith-Petersen and indirectly against the City stands. Finally, the Court grants summary judgment to Defendants on the issue of punitive damages.

## III. The *Daubert* Motion

### A. Legal Standard

Under Federal Rule of Evidence 702, an expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The trial judge acts as the "gatekeeper" of expert witness testimony by engaging in a two-part analysis. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592 (1993). First, the trial judge must determine that the proposed expert witness testimony is based on scientific, technical, or other specialized knowledge. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Second, the trial court must ensure that the proposed testimony is relevant—that it "will assist the trier of fact to understand or determine a fact in issue." *Id.* "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without

the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401.

"The inquiry envisioned by Rule 702" is "a flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* The advisory committee notes on the 2000 amendments to Rule 702 explain that Rule 702 (as amended in response to *Daubert*) "is not intended to provide an excuse for an automatic challenge to the testimony of every expert." *See Kumho Tire*, 526 U.S. at 152. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595 (citation omitted).

### B.     Discussion

Defendants bring a partial *Daubert* motion seeking to preclude certain portions of the intended testimony of Plaintiff's use-of-force expert, Roger Clark. Although Defendants concede that Mr. Clark is a qualified expert entitled to opine on certain aspects of the Officers' use of force, (*see Daubert* Motion at 5, 6), Defendants contend that Mr. Clark's report transgresses the bounds of proper expert testimony in three distinct ways. The Court addresses each in turn.

#### 1.     Ultimate-Issue Testimony

First, Defendants argue that numerous sections of Mr. Clark's report resolve ultimate issues and are thus inadmissible. (*Daubert* Motion at 2–5.) Although an expert opinion "is not objectionable just because it embraces an ultimate issue," *see* Fed. R. Evid. 704(a), an expert opinion may not provide a legal conclusion, *see Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). "The reasoning behind this prohibition is that 'when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Garcia v. Vitus Energy, LLC*, 605 F. Supp. 3d 1179, 1184 (D. Alaska 2022) (quoting *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017). The question, then, is whether Mr. Clark's proffered testimony merely touches upon an ultimate issue, which is permissible, or veritably instructs the jury on an ultimate issue, which is impermissible.

Some of Mr. Clark's report clearly crosses the line. For instance, his assertion that the Officers' conduct was "in violation of . . . law as taught to all officers" does more than simply provide an aid to the jury's deliberation. (*See Daubert* Motion Ex. 1, Report at 25.) It is, on its face, a legal opinion. Although the statement is technically qualified by the phrase "as taught to all officers," the Court finds such qualification insufficient and more likely to confuse than to illuminate. Mr. Clark may not present testimony of this nature.

The remainder of Mr. Clark's report presents a more challenging analysis. The majority of the statements that Defendants attack involve the words "excessive" or "unreasonable." (*Daubert* Motion at 2–5.) The difficulty presented by the use of those words derives from the fact that the terms "excessive" and "unreasonable" are both legal terms of art *and* plain English. It is appropriate for an expert such as Mr. Clark to provide an opinion regarding what a reasonable police officer might do in a given scenario in light of relevant training and police-conduct norms. In doing so, Mr. Clark would not violate the Federal Rules of Evidence simply by using the terms "unreasonable" and "excessive." However, Mr. Clark may not testify that Officers Smith-Petersen or Batway themselves acted unreasonably, as such an assertion would not merely embrace an ultimate issue but would be functionally equivalent to a legal conclusion. Mr. Clark's report straddles this line, at times complying with the relevant evidentiary standard and at times transgressing it.

For instance, Mr. Clark writes that "[i]n my opinion, under the set of facts demonstrated here, the Defendant Officers could not have reasonably believed that any of the [circumstances justifying deadly force] existed at the time they used lethal force on Mr. Singh, who held a knife at his own throat, didn't utter a single threat toward any of the Defendants and never pointed the knife at the Defendants." (Report at 19.) It is clear that Mr. Clark's goal in making that statement was to distinguish the Officers' conduct in this case from the type of conduct that Mr. Clark deems reasonable according to police norms and regulations, but the statement is inappropriate insofar as it explicitly declares that the Officers acted unreasonably in their interactions with Plaintiff. Similarly, Mr. Clark writes

that "[i]n my opinion, under the version of events given by Officers Smith-Petersen and Batway, their (in particular Officer Smith Peterson) use of lethal force was excessive and unreasonable under the circumstances." (Report at 25.) Again, that statement approaches propriety, as it is fundamentally an attempt to compare the conduct of the Officers to the conduct that Mr. Clark would deem reasonable under the circumstances. However, because the statement encompasses a direct assertion that the Officers acted excessively and unreasonably in this case, the statement is impermissible.

Most of the statements in Mr. Clark's report that Defendants attack as improperly adjudicating an ultimate issue are statements that could be salvaged by a reframing. Rather than parse every word of the report in search of evidentiary violations, the Court elects to set forth a broadly applicable principle and to defer resolution of statement-specific disputes until trial. Mr. Clark is permitted to testify on the general reasonableness of police conduct in light of given circumstances, but Mr. Clark may not opine that the Officers in this case acted unreasonably or excessively. *See Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1198 (C.D. Cal. 2015) ("Although the Court finds that [the plaintiffs' expert] is qualified to opine as to whether the officers' use of force was excessive or unreasonable, the Court concludes that such testimony should be explored through hypothetical questioning so as to avoid invading the province of the jury.").

### 2. Mental Health Diagnoses

Next, Defendants attack Mr. Clark's report as providing an opinion on whether and to what extent Plaintiff was suffering from a mental pathology at the time of the shooting. (*Daubert* Motion at 6–7.) The Court rejects this argument as a mischaracterization of Mr. Clark's report. Therein, Mr. Clark states that "it is not the role of or within the capacity of peace officers to attempt to diagnose a person's disability." (Report at 22.) However, Mr. Clark goes on to assert that "officers are trained to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies" and that officers use a wealth of mental-health frameworks as the basis of their recognition of mental pathologies in their day-to-day interactions. (Report at 22.) After describing the training

1 that police officers undergo regarding the practical identification of people with mental
2 abnormalities, Mr. Clark opines that the Officers should have recognized Plaintiff as
3 "possibly mentally ill and/or emotionally distraught" and that Plaintiff exhibited "a clear
4 sign of mental distress" when he repeatedly asked the Officers to kill him. (Report
5 at 21, 22.) This proffered testimony is plainly not a psychological diagnosis of Plaintiff.
6 Rather, it is a characterization of Plaintiff's appearance and the consequences that ought to
7 have followed therefrom. In other words, it is a description of what a reasonable police
8 officer should have concluded based upon the concrete behavior of Plaintiff. Such
9 testimony is within the ambit of Mr. Clark's expertise. Defendants also criticize Mr. Clark
10 for writing that Plaintiff "suffered from PTSD, drug addiction, and ADHD," (*Daubert*
11 Motion at 6), but Defendants omit important context. The full statement, which is located
12 in the background section of the report, is that "[a]ccording to Sunita Singh (his mother),
13 Mr. Singh suffered from PTSD, drug addiction and ADHD." (Report at 3–4.) Whether such
14 an averment would be impermissible hearsay is not at issue here.[3] Plainly, however, Mr.
15 Clark has not diagnosed Plaintiff with any particular mental malady.

16 The Ninth Circuit has repeatedly held that police officers must consider whether the
17 person against whom they contemplate using force is mentally ill or emotionally disturbed.
18 *See, e.g.*, *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010). Indeed, the Ninth
19 Circuit held in the instant case that "the officers 'were or should have been aware that
20 [Plaintiff] was emotionally disturbed.'" *Singh*, 124 F.4th at 754 (quoting *Glenn*, 673 F.3d
21 at 875). If those holdings are to have any meaning, use-of-force experts must be able to
22 provide testimony regarding how a reasonable police officer ought to interpret a given
23 person's outward behavioral manifestations. Defendants' motion is therefore unavailing on
24 this basis.

25                 **3.  Contravention of the Video Evidence**

26 Defendants' final Daubert contention is that Mr. Clark's report is based on
27 inadequate data because it contradicts the video evidence in this case. (*Daubert* Motion

28 ---
[3] In any event, Ms. Singh's averment would be addressed easily under Federal Rule of Evidence 703.

- 16 -

at 7–11.) The Court rejects this argument as not meaningfully substantiated. The majority of Defendants' briefing on this point consists of quoting Mr. Clark's report without explaining in what way it is inconsistent with the video. (*See Daubert* Motion at 9–10.) Even where Defendants do attempt to explain the purported infirmity of Mr. Clark's report, their arguments fall flat. Defendants object to Mr. Clark's statement on page five of his report that:

> After she took a position on the passenger's side of her patrol unit, Officer Smith-Petersen said, "If you come any closer, I will kill you!" Based on the video/audio recording, Mr. Singh did not advance and simply held the knife at his throat and stood approximately 10 feet west of Officer Smith-Petersen's patrol car.

(*Daubert* Motion at 9.) Defendants characterize Mr. Clark's report as a misrepresentation because, according to Defendants, "[t]he video clearly shows Singh advancing towards the officers at multiple points." (*Daubert* Motion at 9.) Defendants elide the fact that Mr. Clark states on page six of his report that Mr. Singh did in fact advance "toward the front bumper of Officer Smith-Petersen's patrol car" even after Officer Smith-Petersen had told him not to do so. Mr. Clark goes on to recount that:

> As Mr. Singh approached Officer Smith-Petersen's patrol car, and despite their being ample room to move about—including behind her patrol car—neither Officer SmithPeterson nor Officer Batway made any attempt to move to create more distance or obtain a safer position of "cover". Per the recording, both of the Officers chose not to reposition up but rather to stand their ground. As Mr. Singh slowly stepped toward her patrol car, Officer Smith-Petersen shot and wounded him in the abdomen/pelvic region.

(Report at 6.) Defendants do not meaningfully grapple with Mr. Clark's report.

Defendants also contend that Mr. Clark's report is unsupported because he states that the Officers did not use de-escalation techniques, whereas Defendants claim that they utilized the primary de-escalation technique of "issu[ing] over twenty lawful orders to drop his weapon or stop moving," as well as talking with Plaintiff and assuring him that they did not think he was crazy. (*Daubert* Motion at 9–10.) Again, Defendants' argument rests

upon an overly simplistic characterization of the parties' dispute. Mr. Clark gives the following examples of de-escalation techniques:

> a. Slow down and elongate the encounter with the suspect;
> b. Establish a relationship and rapport with the suspect, by asking his name, introducing themselves by name, explaining why they were called, asking open-ended questions, or offering options, etc.;
> c. Communicate empathy to the suspect by explaining that they were there to help him and reassuring him that he is safe, etc.; and
> d. Speak in a calm demeanor and avoid yelling - officers are taught that if they take a less authoritative, less controlling, less confrontational approach, they actually will have more control.

(Report at 5–6.) It is unclear whether ordering a person to disarm and stop moving constitutes de-escalation as Mr. Clark's report conceives of it, and if it does not, it is unclear whether the relatively small amount of additional interlocution employed by the Officers constitutes meaningful de-escalation. Thus, there appears to be a bona fide dispute as to whether the Officers did in fact utilize sufficient de-escalation procedures. The Court expresses no opinion on the resolution of that dispute, but it rejects Defendants' argument that Mr. Clark's report is so factually unsupported that his testimony ought to be precluded as a matter of law. Defendants are free to address and probe the perceived insufficiencies of Mr. Clark's opinion on cross-examination.

### C.   Conclusion

The Court grants Defendants' *Daubert* motion insofar as it seeks to preclude Mr. Clark from providing testimony that so resolves ultimate issues as to constitute jury instruction, but denies it on all other bases.

## IV.   Conclusion

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' Motion for Summary Judgment (Doc. 52). The Court grants summary judgment to Defendants on Count Two (negligence and gross negligence) and Count Three (negligent hiring, training, supervision, and retention) of Plaintiff's Complaint (Doc. 85-1 Ex. 1), as well as on the issue of punitive damages generally. Count One (assault and battery) and Count Four (civil rights violation under § 1983) shall proceed to trial.

1  **IT IS FURTHER ORDERED** granting in part and denying in part Defendants' *Daubert* Motion (Doc. 46) as described hereinabove.

**IT IS FURTHER ORDERED** setting a <u>telephonic</u> Status Conference on **June 27, 2025** at **9:30 AM** (Arizona time) before District Judge John J. Tuchi in Courtroom 505, 401 W. Washington Street, Phoenix, AZ 85003. Self-represented parties and counsel who will try the case shall have their calendars available and be prepared to discuss the trial schedule, length of trial, and any other issues related to trial of this matter. Chambers will e-mail dial-in information to all self-represented parties or counsel prior to the conference.

**IT IS FURTHER ORDERED** that no later than two days prior to the telephonic status conference, the parties shall file a joint notice to the Court setting out (1) their estimated number of trial days, to include jury selection (if applicable); and (2) if a Prescott case, whether the parties will stipulate to using a Phoenix jury.

At this initial Status Conference, the Court will set a schedule for the parties to file joint proposed questions for a prescreening juror questionnaire, a joint proposed pretrial order, a joint stipulated statement of the case, joint proposed *voir dire* questions, joint proposed jury instructions, a joint stipulated form of verdict, witness and exhibit lists, a trial memorandum of law, and motions *in limine*. The Court will also set a schedule for the Final Pretrial Conference and a firm trial date.

Dated this 12th day of June, 2025.

_____
Honorable John J. Tuchi
United States District Judge